# EXHIBIT F

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

3   ----------------------------------------X
    KING RANGE, JR.,

4

                           PLAINTIFF,

5
         -against-        Case No:

6                        17 CV 00149

7   230 WEST 41ST STREET, LLC, HAT TRICK PIZZA,
    INC., DOMINO'S PIZZA, LLC AND DOMINO'S

8   PIZZA FRANCHISING, LLC,

9                        DEFENDANTS.
    ----------------------------------------X

10

11               DATE:  December 3, 2019

12               TIME:  2:00 P.M.

13

14

15         DEPOSITION of a Nonparty

16   Witness, DAVID WEINER, taken by the

17   Plaintiff, pursuant to a Notice and to the

18   Federal Rules of Civil Procedure, held at

19   the offices of Parker Hanski, LLC, 40 Worth

20   Street, New York, New York 10013, before

21   Breindle Sara Friedman, a Notary Public of

22   the State of New York.

23

24

25

```
 1                    D. WEINER
 2          Q.    Have you ever testified at a
 3    deposition before?
 4          A.    Yes.
 5          Q.    How many times?
 6          A.    Once.
 7          Q.    What was that concerning?
 8          A.    That was a fee dispute with a
 9    former client from a long time ago.
10          Q.    Have you ever testified at
11    trial?
12          A.    Probably that same matter, yes.
13          Q.    Did there come a point in time
14    that you were asked to perform work for the
15    building that is known as 230 West 41st
16    Street or 219 West 40th Street?
17          A.    Yes.
18          Q.    When were you first retained?
19          A.    Retained or contacted?
20          Q.    Let's start with contacted,
21    when were you first contacted?
22          A.    I was contacted about this, I
23    think, the summer of 2017.  I was retained
24    in early 2018.
25          Q.    Who contacted you in the summer
```

1                    D. WEINER

2     of 2017?

3          A.    John Egan from Seyfarth Shaw.

4          Q.    Have you ever performed any

5     work with John Egan before?

6          A.    I have.

7          Q.    On what other projects have you

8     performed work?

9          A.    I had worked on a residential

10    lobby, West End Avenue.  And about the same

11    time as this Domino's matter I had also

12    done some visibility studies for a

13    restaurant on East 6th Street.

14         Q.    At any point in time, have you

15    ever been retained by John Egan or his law

16    firm to serve as an expert witness in

17    litigation?

18         A.    No.

19         Q.    Do you currently have a written

20    agreement regarding the scope of your

21    retention?

22         A.    For the Domino's matter?

23         Q.    Yes.

24         A.    Yes.

25         Q.    What do you understand the

```
 1                     D. WEINER
 2     scope of the work to be for the Domino's
 3     matter?
 4          A.     We were asked to see if we
 5     could figure out how to make the front
 6     entry accessible for ADA regulations.
 7          Q.     Have you ever done anything
 8     like this work before?
 9          A.     Yes.
10          Q.     How many other times have you
11     done that?
12          A.     Maybe a dozen.
13          Q.     In those dozen situations where
14     you were asked to make a front entry
15     accessible, have you drawn up plans to make
16     that entryway accessible?
17          A.     Yes.
18          Q.     Are you aware of your plans
19     ever being filed with a New York City
20     governmental agency in order to perform the
21     construction?
22          A.     Yes.
23          Q.     Are you aware of what the
24     status was with those filings or
25     applications for any of those matters that
```

```
 1                      D. WEINER
 2         Q.    You described for me before the
 3   scope of the work that you were retained to
 4   perform.
 5               My question to you is, did that
 6   scope of work ever change during the course
 7   of your retention?
 8         A.    No.
 9         Q.    Can you describe for me the
10   work that you performed after you were --
11         A.    We were asked to locate how to
12   make the entryway accessible.  I said there
13   were three potential ways we might be able
14   to achieve that.
15               One was to look at the
16   possibility of a ramp.  The other one was
17   to look at the possibility of a vertical
18   platform lift.  And the third possibility
19   was a fold down incline lift.
20         Q.    How did you go about analyzing
21   which of these three options would be the
22   best?
23         A.    In conjunction with the
24   structural engineer, because he was an
25   intricate part of what was necessary to
```

1                    D. WEINER
2     make the modifications, we looked at all
3     three of those possibilities and in the end
4     concluded that the incline lift would be
5     the most effective.
6          Q.    When you say most effective,
7     most effective in what?
8          A.    In the sense that there were
9     some structural implications that prevented
10    us from putting in a vertical platform
11    where it would have made sense.
12               The concern about a ramp was
13    how much physical space that would take and
14    how much structure would be required
15    underneath to support it.
16               It was our feeling that the
17    most minimal amount of intervention would
18    be the incline lift scenario.
19         Q.    Aside from you and the
20    structural engineer -- by the way, who was
21    the structural engineer that you used?
22         A.    David Keane.
23         Q.    Aside from you and David Keane,
24    did you involve anyone else in your
25    analysis of the three options that you just

```
 1                    D. WEINER
 2   mentioned?
 3        A.    I don't recall if we may have
 4   spoken to the lift people about that.
 5        Q.    After you concluded along with
 6   the structural engineer that the incline
 7   lift would be the most effective, what, if
 8   anything, did you do to implement that?
 9        A.    We prepared drawings that
10   reflected that design scenario.
11        Q.    I will show you a document
12   that's been previously marked as
13   Plaintiff's Exhibit 6.  It's a multi-paged
14   document Bate stamped 230 West 41st 01 to
15   09.  I ask you to take a look at these
16   pages.
17             When you are finished looking
18   at those pages my question to you is, do
19   you recognize what this document is?
20        A.    I do recognize it.
21        Q.    What do you recognize it to be?
22        A.    These are the set of drawings
23   that I -- it's a combination of
24   architectural drawings and structural
25   drawings.  The architectural drawings were
```

```
 1                      D. WEINER
 2    prepared by me.  It's a progress that's
 3    dated November 2, 2018.
 4                There is a set of structural
 5    drawings prepared by David Keane's office
 6    stapled to this.
 7         Q.    Would the structural drawings
 8    by David Keane be the documents that are
 9    identified as shoring notes with an S at
10    the end starting at 06 to 09?
11         A.    I'm sorry, where is that?
12                I think the S stands for
13    structure.  Yes, I see it.
14                MR. EGAN:  Let the record
15           reflect the witness is referring to
16           the document number six.  Page number
17           six of the exhibit.
18         A.    David Keane's is dated
19    November 2, 2018, the same as mine.
20         Q.    Did you draft the documents
21    that are on Plaintiff's Exhibit 6 numbers
22    one through five?
23         A.    The ones that have my name on
24    the title block, yes.
25         Q.    Can you tell me what one
```

1                    D. WEINER
2      through five, what those documents reflect,
3      what the purpose of it is?
4           A.    These were put into format so
5      that we could eventually file with the New
6      York City Department of Buildings.  We have
7      a combination of general notes.  We have a
8      demolition plan.  We have specifications
9      for the incline lift that was referenced.
10     We have a floor plan page 301 showing the
11     incline lift.
12               We also have an elevation of
13     sections on A400.  And we have a section on
14     A401.  That is drawing five of five.
15          Q.    Can you just start with page
16     two of Plaintiff's Exhibit 6, and my
17     question to you is, just tell me generally
18     what this page depicts.
19          A.    Are you referring to A300?
20          Q.    Yes.
21          A.    That would be the demolition
22     plan on the left.  There are some notes
23     indicating what is to be removed.  There
24     are some general demolition notes in the
25     margin.  And we also have the incline lift

```
 1                    D. WEINER
 2         A.    No.
 3         Q.    Did you have any opinion as to
 4  whether it was possible or not possible to
 5  implement what David Keane had drawn?
 6         A.    I was very concerned about the
 7  variables and things that we did not know.
 8         Q.    What variables were you
 9  concerned with?
10         A.    In the basement there are an
11  enormous number of pipes, valves and things
12  of that nature that would be potentially
13  impacted by this new structure.  I would
14  assume that many of those pipes would have
15  to be relocated or at least disconnected
16  during the construction.
17              And also, we had some concerns
18  about the stability of the walls given the
19  age of the building.  We also had concerns
20  about the slab because the new design
21  requires some columns and some new
22  footings.
23              And I do not recall having any
24  geotechnical advice at that time to
25  determine the feasibility of what those
```

```
 1                    D. WEINER
 2   footings would be able to bear on.
 3          Q.    Can you tell me, you used the
 4   word geotechnical?
 5          A.    Yes.  Geotechnical.  Someone
 6   who assesses the bearing capacity of the
 7   soil.  Geotechnical engineer.
 8          Q.    Are you in your work, do you
 9   ever perform geotechnical engineering work?
10          A.    I don't as an architect.  That
11   is typically the purview of the structural
12   engineer.
13          Q.    A structural engineer would be
14   performing that?
15          A.    Yes.
16          Q.    Would the structural engineer
17   address or research the concerns that you
18   would have with stability?
19          A.    Yes.
20          Q.    What other concerns would a
21   structural engineer also research that you
22   had with respect to this project?
23          A.    He would be looking at the
24   bearing capacity of what he was tieing into
25   in terms of existing conditions.  He would
```

1                    D. WEINER
2    the impact to the building itself from
3    implementing your plans, Plaintiff's
4    Exhibit 6, aside from what is contained
5    here?
6         A.    No.
7         Q.    Did you ever perform any
8    analysis to the impact upon the Domino's
9    store and their operations from
10   implementing your plans, Plaintiff's
11   Exhibit 6?
12        A.    No.
13        Q.    Did you ever communicate with
14   anyone at the Domino's store or on behalf
15   of Domino's aside from John Egan?
16        A.    No.
17        Q.    Have you ever heard of a person
18   by the name of Doug Anderson or Douglas
19   Anderson?
20        A.    Doesn't ring a bell.
21        Q.    Were you ever shown any expert
22   reports or analysis relating to this
23   particular litigation?
24        A.    Can you be more specific?
25        Q.    Did you ever see an expert

```
 1                      D. WEINER
 2   report concerning the Domino's, the
 3   accessibility of the Domino's store that we
 4   have been talking about on West 40th
 5   Street?
 6        A.    There was a diagram drawing
 7   that John Egan had shared with me when he
 8   first contacted me about this.  It showed a
 9   ramp is what it showed.
10        Q.    Aside from seeing that diagram,
11   did you ever see any other documents
12   relating to the wheelchair accessibility of
13   the Domino's store on West 40th Street?
14        A.    No.
15        Q.    Aside from speaking with John
16   Egan and David Keane, did you ever have any
17   communications with anyone else regarding
18   the wheelchair accessibility of the
19   Domino's Pizza store, and also putting
20   aside the persons that you communicated
21   with for implementing your plans?
22             MR. EGAN:  Objection to form.
23             You can answer.
24        A.    No.
25             Can you repeat the question
```

1                         D. WEINER

2       just before that?

3                    Had I seen any other diagrams,

4       is that what you were asking?

5            Q.    I will do it like this.  I will

6       show you a document that's been previously

7       marked as Plaintiff's Exhibit 12.

8                    My question to you is, have you

9       ever seen this particular document before?

10           A.    Yes, I have.  This is a plan of

11      the basement.

12           Q.    When did you first get this

13      document?

14           A.    When we first started the

15      project.  Normally when we start a project

16      we ask the client if they have any existing

17      drawings.  This is what was produced per

18      that question.

19                    MR. PARKER:  Mark Plaintiff's

20               Exhibit 13.

21                    (Whereupon, the aforementioned

22               diagram was marked as Plaintiff's

23               Exhibit 13 for identification as of

24               this date by the Reporter.)

25           Q.    I will show you a document

1                      D. WEINER
2      that's been marked Plaintiff's Exhibit 13.
3                      My question to you is, have you
4      ever seen this document before?
5           A.    Yes.   This is that diagram I
6      referred to a moment ago.   This was given
7      to me at the beginning of the project.
8           Q.    When you received this
9      document, did it have this handwriting on
10     it?
11          A.    No.   That's my handwriting.
12          Q.    Is all of the handwriting on
13     this document your handwriting?
14          A.    Yes.
15          Q.    What is the purpose of your
16     handwriting?
17          A.    Those were field measurements
18     that I took to verify the geometry of the
19     diagram as a means of creating a base
20     drawing for us.
21          Q.    Do you have any knowledge as to
22     who created this drawing?
23          A.    I don't know.   There is no
24     title block or anything like that.
25          Q.    Do you have any knowledge as to

1                    D. WEINER
2    why this document was created?
3         A.    No.
4         Q.    Did you ever perform any
5    analysis regarding whether this diagram,
6    the accessible entrance ramp concept, could
7    actually be implemented as its drawn?
8         A.    As I mentioned earlier, we did
9    propose three scenarios that we looked at.
10   One included a ramp.  So, in a sense it was
11   a sort of derivation of this sketch.
12        Q.    When you were looking at a ramp
13   option, did you believe that implementing
14   the ramp option would be possible?
15        A.    It would be possible.  But as I
16   mentioned before, we concluded that it was
17   a lot of additional work structurally, less
18   feasible.
19        Q.    When you described the options,
20   your plans, Plaintiff's Exhibit 6, have, I
21   believe, just one option?
22        A.    Correct.
23        Q.    Were the other options ever put
24   down on paper by you?
25        A.    Yes.  You probably have a copy

1                    D. WEINER

2        Q.    After you received the

3    structural plans from David Keane, did you

4    have any further concerns regarding the

5    implementation of your drawings that are on

6    Plaintiff's Exhibit 6?

7        A.    You need to clarify which

8    structural plans that you are referring to

9    because this one developed as part of a

10   process.

11       Q.    I understand.  I am not trying

12   to make this more complicated.

13             My question pertains just to

14   Plaintiff's Exhibit 6, these drawings that

15   are here.

16       A.    Those drawings were done before

17   these.

18       Q.    I understand that.

19             After these drawings were done,

20   Plaintiff's Exhibit 6, did David Keane

21   address all the concerns you had regarding

22   implementation of your plans?

23             MR. EGAN:  Objection to form.

24       A.    Yes.

25       Q.    Did he address them to your

```
 1                    D. WEINER
 2   satisfaction?
 3         A.    Yes.
 4              Let me clarify, except for the
 5   variables we did not know and still do not
 6   know, such as the impact of this design on
 7   the existing pipes and things that are
 8   currently on the wall.  And the
 9   geotechnical information related to putting
10   in new footings.
11         Q.    Did there ever come a point in
12   time where you felt that you would need to
13   retain a geotechnical professional to
14   analyze your concerns?
15         A.    I think that is a more
16   appropriate question for David Keane
17   because it affects his structure.
18         Q.    Did David Keane ever tell you
19   that he felt that he needed to retain a
20   geotechnical professional in order to have
21   your plans implemented?
22         A.    It was information we knew that
23   we would at some point have to get.
24         Q.    At what point in the process
25   of -- with relation to filing the plans do
```

```
1                      D. WEINER
2    to your expediter to file?
3         A.    No.
4         Q.    Was there ever a point in time
5    where someone told you that you would not
6    be doing any filing?
7         A.    No.
8         Q.    Did you ever do any filing or
9    ask anyone to do any filing on behalf of
10   this project?
11        A.    No.
12        Q.    Did anyone ever tell you not to
13   do any filing for this particular project?
14        A.    No.
15        Q.    I will show you a document that
16   we previously marked as Defendant's
17   Exhibit 25.
18             My question to you is, do you
19   recognize this document?
20        A.    I do.
21        Q.    What do you recognize it to be?
22        A.    It's a proposal from the
23   company Handi Lift.  They are the people
24   that would be supplying the incline lift.
25        Q.    Handi Lift would be supplying
```

```
1                   D. WEINER
2   the Handi Lift, and would they also be
3   installing the Handi Lift as well?
4        A.    Yes.  They typically do their
5   own installation.
6        Q.    On the second page there is a
7   price of $23,969?
8        A.    Yes.
9        Q.    Are you aware of any additional
10  cost that would have been incurred with
11  regard to Handi Lift's proposal?
12       A.    Yes.
13       Q.    What else?
14       A.    This was a laborer building.
15  So, Handi Lift would have to supply laborer
16  installers to do the -- I'm sorry, union
17  installers to do this work.  That was not
18  included in this proposal.
19       Q.    Do you know how much different
20  the cost would be to use union laborers?
21       A.    I do not.
22       Q.    Did you ever inquire of anyone
23  to that?
24       A.    Not relative to Handi Lift.
25       Q.    Did you ever speak to anyone
```

```
 1                    D. WEINER
 2   mentioned?
 3        A.    Yes.
 4        Q.    What communications do you
 5   recall?
 6        A.    We discussed this as being the
 7   least expensive one for our particular
 8   configuration.
 9        Q.    Were you ever given a budget as
10   to how much the project should cost?
11        A.    No.
12        Q.    Were you ever told that above
13   any particular amount of money the project
14   would not go forward?
15        A.    No.
16        Q.    I will show you a document that
17   has been previously marked as Defendant's
18   Exhibit 24.
19              My question to you is, do you
20   recognize that particular document?
21        A.    I do.
22        Q.    What do you recognize it to be?
23        A.    This was one of the bids from
24   one of the contractors that I asked to give
25   us a budget.
```

```
1                    D. WEINER
2        Q.    What kind of work was this
3   contractor performing?
4        A.    He was a general contractor who
5   was making his proposal based on the
6   drawings you showed me earlier.
7        Q.    Aside from this financial
8   proposal that this contractor is
9   identifying on Exhibit 24, were you aware
10  of any other contract or related cost that
11  would be incurred outside of the amount
12  that this particular document is quoting?
13       A.    Yes.
14       Q.    What were you aware of?
15       A.    Well, he has some exclusions.
16  And if you look at item 11 on the second
17  page, for qualifications and exclusion he
18  mentioned that budget excluded any MEPS
19  relocates that may be necessary in the
20  cellar to accommodate either saw cutting
21  the floor slab or installing the new steel
22  or concrete footings.
23       Q.    Did your architectural plans,
24  Plaintiff's Exhibit 6, identify any MEPS
25  work that would be performed?
```

1                        D. WEINER
2          A.    I don't know how they arrived
3     at that number.
4          Q.    Do you know how they arrived at
5     any of their other numbers?
6          A.    No, I do not.  I did not get
7     that far in the process.
8          Q.    Had you ever worked with this
9     contractor before?
10         A.    I have not.
11         Q.    Do you have any knowledge as to
12    the accuracy of their cost breakdowns?
13         A.    Well, there is a competitive
14    bid.  Normally we try to get two or three
15    bids to sort of gauge these against each
16    other.
17         Q.    Did you ever get to the point
18    where you actually performed an analysis of
19    comparing bids?
20         A.    No, we did not.
21         Q.    Did anyone ever tell you not to
22    go forward with comparing any bids?
23         A.    No.
24         Q.    I will show you a document that
25    was marked as Defendant's Exhibit 23.

```
  1                       D. WEINER
  2                My question to you is, had you
  3     ever seen that document before?
  4          A.    Yes.
  5          Q.    What do you recognize it to be?
  6          A.    This is another bid that we
  7     acquired.
  8          Q.    That was from Qwest
  9     Contracting, that is Q-W-E-S-T Contracting?
 10          A.    Correct.
 11          Q.    They were proposing $199,000?
 12          A.    Correct.
 13          Q.    Did you ever have any
 14     communications with them about their bid,
 15     Defendant's Exhibit 23?
 16          A.    I did not.  We did not get that
 17     far.
 18          Q.    After you received this
 19     document, Defendant's Exhibit 23, what, if
 20     anything, did you do with it?
 21          A.    It was sent to John Egan's
 22     office.
 23          Q.    Does this Plaintiff's
 24     Exhibit 6, does this identify when you
 25     finished working on this document?
```

```
 1                      D. WEINER
 2    wheelchair accessible lift being installed
 3    inside the Jack -- at the entrance to the
 4    Jack premises?
 5         A.    I am not.
 6              (Whereupon, a short recess was
 7         taken.)
 8              MR. PARKER:  Mark 19.
 9              (Whereupon, the aforementioned
10         documents were marked as Plaintiff's
11         Exhibit 19 for identification as of
12         this date by the Reporter.)
13         A.    I would like to offer one
14    clarification, if I may.  You were asking
15    previously about the contractors.  And I
16    failed to mention we did reach out to
17    additional contractors.  In fact, we
18    reached out to four contractors.
19              One of them declined, didn't
20    even return the calls.  Another one
21    declined.  There is an e-mail somewhere in
22    that stack showing that.  And then part of
23    the challenge was finding union contractors
24    for this particular building.
25              I just wanted you to know we
```

```
 1                    D. WEINER
 2    did attempt to find more contractors.
 3         Q.    When you say more contractors
 4    you are talking about in addition to Qwest
 5    Contracting, as well as Redy Contracting
 6    Group?
 7         A.    Correct.
 8         Q.    Going back to the contract for
 9    Qwest Contracting, to your knowledge, did
10    this proposal here also include them
11    providing a wheelchair lift and installing
12    that wheelchair lift if you look
13    specifically to three?
14         A.    Yes, it does.  It does mention
15    it as item 14 400.
16         Q.    Do you know how much this
17    contractor, Qwest Contracting, putting in
18    the wheelchair lift and installation, what
19    impact that had on the ultimate price that
20    they quoted you?
21              MR. EGAN:  Objection to form.
22              You can answer.
23         A.    I do not know.
24         Q.    Did you ever have any
25    communications with Qwest Contracting or
```