UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
KING RANGE, JR.,                                         :
                                                        :
                          Plaintiff,                    :
                                                        :
                 -against-                              :        Case No.: 1:17-cv-00149-LAP
                                                        :
230 WEST 41ST STREET LLC, HAT TRICK                     :
PIZZA, INC., DOMINO'S PIZZA LLC AND                     :
DOMINO'S PIZZA FRANCHISING LLC,                         :
                                                        :
                          Defendants.                   :
                                                        :
------------------------------------------------------- X

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS UNDER LOCAL CIVIL RULE 56.1

Under Local Rule 56.1 and the Local Civil Rules of this Court, Defendants 230 West 41st

Street LLC ("230 West") and Hat Trick Pizza, Inc. ("Hat Trick") (collectively, "Defendants")

respectfully submit this statement of undisputed material facts in support of their motion for

summary judgment.[1]

## PARTIES

1.      Plaintiff King Range Jr. ("Plaintiff") resides at 855 Cortland Avenue in the Bronx.

(Egan Dec., ¶ 5, Ex. B ("Pl. Dep."), 12:20-23.)

2.      Plaintiff is 33 years old.  (Pl. Dep., 17:2-3.)

3.      Plaintiff has had Cerebral Palsy since birth.  (Pl. Dep., 89:24-90:5.)

---

[1]     The undisputed facts set forth herein are followed by citations to their support in the
record as set forth in, and annexed as Exhibits ("Ex.") to, the Declaration of John W. Egan,
dated February 7, 2020 ("Egan Dec."), the Declaration of Robert Lloyd Cookston, dated
February 4, 2020 ("Cookston Dec."), the Declaration of David J. Weiner, dated February 4,
2020 ("Weiner Dec."), the Declaration of David Keane, dated February 4, 2020 ("Keane
Dec."), the Declaration of Jerry Steele, dated February 7, 2020 ("Steele Dec."), the Declaration
of John Serao, dated February 4, 2020 ("Serao Dec."), and the Declaration of Susan Ryan,
dated February 7, 2020 ("Ryan Dec.").

4.      Plaintiff ambulates using an electric wheelchair.  (Pl. Dep., 89:19-90:2.)

5.      Plaintiff travels around New York City by subway and bus, but does not use Access-A-Ride.  (Pl. Dep., 25:12-16, 25:24-26:7, 94:3-6.)

6.      Plaintiff has never been employed, ████████████████████████, and has other financial support.  (Pl. Dep., 16:22-24, 17:19-18:17, 138:24-139:5.)

7.      230 West 41st Street LLC ("230 West") is the owner of the building located at 219 West 40th Street, New York, NY 10018 (the "Building").  It acquired the Building in July 2004.  (Steele Dec., ¶ 4.)

8.      The Research Foundation of The City University of New York (the "Foundation") is the sole member of 230 West. (Egan Dec., ¶ 7, Ex. D ("Steele Dep."), 8:15-9:2; Steel Dec., ¶ 2.)  No other entity has an ownership interest in 230 West.  (*Id*. at 9:3-6.)

9.      230 West has no employees of its own.  Rather, back-office services are provided to 230 West by the Foundation, and 230 West operates the Building through Colliers International ("Colliers"), a third-party management company.  (Steele Dec., ¶ 6.)

10.     The Foundation is the fiscal agent for all grants and contracts for the City University of New York ("CUNY").  (Steele Dec., ¶ 11.)

11.     On the ground floor of the Building there is a Domino's pizza store (the "Property"), which is a commercial tenant of 230 West.  (Steele Dep., at 14:2-4; Steele Dec., ¶ 4.)  Hat Trick operates the Property, which has a street address of 227 West 40th Street, New York, NY 10018.  (Egan Dec., ¶ 11, Ex. H ("Cookston Dep."), 10:11-16.)

12.     Hat Trick is owned by Robert L. Cookston ("Cookston").  Rolling in the Dough, a management and service company, also has an ownership interest in Hat Trick.  (Cookston Dep., 13:14-14:4.)

13.     Hat Trick currently employs 27 people at the Property.  (Cookston Dec., ¶ 5.)

14.     Rolling in the Dough also manages 49 Domino's pizza stores in the Tri-State area, is located at 7720 Windsor Highway, Allentown, Pennsylvania 18106, and employs 5 people. (Cookston Dec., ¶ 3.)

15.     ███████████████████████████████████████████████████
████.  (Cookston Dec., ¶ 7.)

16.     The entities that Rolling in the Dough manages are expected to fund any alterations or improvements through their own revenues and operate as independently profitable stores.  (Cookston Dec., ¶ 8.)

## PROPERTY OVERVIEW

17.     The Building is approximately 100 years old and, as per the Certificate of Occupancy dated January 11, 1933, it was formerly owned by the *N.Y. Herald-Tribune* newspaper.  (Egan Dec., ¶ 14, Ex. K; Keane Dec. ¶ 3; Egan Dec., ¶ 12, Ex. I ("Mitchell Dep."), 185:12-186:3.)

18.     Based on a historical photograph of the Building, part of the ground floor was previously used as a loading dock.  (Egan Dec., ¶ 15, Ex. L.)

19.     There is a significant slope between the Building lobby and the Property entrance. Because the sidewalk slopes down towards the Property entrance from the Building lobby, the concrete slab at the Property is above the grade of the sidewalk.  (Serao Dec., ¶ 6.)

20.     Specifically, the floor of the Property is approximately two feet higher than the sidewalk, and there are two steps leading from the sidewalk to the floor.  (Cookson Dec., ¶ 11.)

21.     Hat Trick became a commercial tenant of 230 West in April 2002.  (Cookston Dep., 38:24-39:23.)

22.    Before Hat Trick, the Property was leased by a Le Croissant store ("Le Croissant").  (Cookston Dep., 38:15-23; Egan Dec., ¶ 8, Ex. E ("Serao Dep."), 12:2-7.)

23.    230 West has a contract with Colliers, to include the management of tenant renovations at the building.  (Steele Dep., 10:20-11:23.)

24.    Upon information and belief, this lawsuit is the first ADA accessibility complaint of any kind against the Property.  (Cookston Dec., ¶ 14.)

## ORIGINAL CONSTRUCTION OF THE PIZZA STORE AT THE PROPERTY

25.    When Hat Trick moved into the Property in April 2002, it built out the pizza store with the assistance of an architect and contractor.  (Cookston Dep. 41:13-24.)

26.    Available documents show that the cost of 2002 build-out of the new Domino's store was $278,200.00.  (Egan Dec., ¶ 17, Ex. N.)

27.    Hat Trick took out a bank loan for the build-out for approximately ████.  (Cookston Dep., 54:23-55:14, 59:2-20.)

28.    Hat Trick did not make changes to the entrance of the Property as part of the build-out.  (Cookston Dec., ¶ 9.)

29.    When Hat Trick took possession of the Property in 2002, there was a door connecting the Le Croissant shop to the adjacent Building lobby.  (Egan Dec., ¶ 16, Ex. M.)

30.    As part of the 2002 build-out, Hat Trick patched the opening of the door with sheetrock.  (Serao Dep., 44:22-45:3.)

## RENOVATION OF THE BUILDING LOBBY

31.    In 2002, there was a step between the public sidewalk and the adjacent Building lobby of approximately 5 inches, which was comprised of granite rather than concrete slab.  (Serao Dec., ¶ 5.)  At that time, the doors to the Building were locked after 5:00 p.m.  (Serao Dec., ¶ 5.)

32.     The step at the Building lobby was removed between 2006 and 2008 as part of the lobby alteration.  (Serao Dec., ¶ 7.)

33.     The work also included the walls, flooring, turnstiles, and a new security desk. (Serao Dep., 22:20-23:5.)

34.     The CUNY School of Journalism funded the majority of the costs incurred for the Building lobby renovation project.  (Steele Dep., 39:13-20.)

35.     As part of the new lease for the CUNY School of Journalism, 230 West provided some funds for the remodeling by way of a work letter, which is provided to commercial tenants upon signing a new lease.  (Steele Dep., 39:21-40:15, 67:3-14.)

**RENOVATION OF THE 41ST STREET BUILDING LOBBY**

36.     In addition to the Building, 230 West owns the adjacent property located at 230 West 41st Street, New York, NY 10036 ("West 41st Street Building").  (Steele Dec., ¶ 5.)

37.     In order to remain competitive in the commercial lease business, 230 West had to conduct a full renovation of the West 41st Street Building lobby, for which the budget was $2,219,020.  (Steele Dep., 31:24-32:2.)

38.     Certain aspects of the planned renovation to the West 41st Street Building lobby were not performed because of financial considerations.  (Steele Dep., 52:7-17.)

39.     This renovation did not involve any work on the West 41st Street sidewalk. (Steele Dep., 37:12-25.)

**2014-2015 PROPERTY REMODEL**

40.     In 2014-15, the Property was remodeled by Hat Trick based on requirements of the franchisor.  (Cookston Dep., 45:6-14, 68:7-11.)

41.     Hat Trick had to close the Property for approximately three weeks to accommodate the construction.  (Cookston Dep., 44:21-46:6.)

42.     The plans prepared by Hat Trick's architect showed, among other things, the construction of an interior ramp leading from the bottom of the second step to the elevated floor of the Property.  (Egan Dec., ¶ 19, Ex. P.)

43.     The problem with the design for the interior ramp was that, while it would eliminate the second step, the first step would remain.  For this, and other reasons, the ramp was not constructed.  (Cookston Dep., 83:24-86:5.)

44.     Other building elements shown on the drawings were also not constructed.  For example, the plans contemplated the construction of a restroom for customer use (in addition to the existing employee-only restroom), as well as modifications to the walk-in cooler in the employee-only area, neither of which occurred.  (Cookston Dep., 79:5-81:25.)

45.     In terms of changes actually performed as part of the remodel, the floor tile at the customer service area was changed to align with the new image of the store.  (Cookston Dep., 103:13-25.)

46.     In addition, Hat Trick installed a "diamond plate" surface at the entrance steps to maintain and protect the tile, including the tile edge. (Cookston Dep., 96:4-98:6.)

47.     Further, the laminate on the countertops was changed, new exterior signs were installed, and changes were made to customer seating.  (Cookston Dep., 99:19-101:5; Cookston Dec., ¶ 12.).

48.     There were no additional changes to the public-facing elements of the Property, including the entrance.  (Cookston Dec., ¶¶ 10, 12.)

49.     Available documents show that the total cost of the 2014-15 remodel was $173,155. (Egan Dec., ¶ 18, Ex. O.)

50.     Most of the work performed between the time that Hat Trick opened the pizza shop at the Property and the present involved installing new pizza ovens, upgrading employee work stations, making changes to décor and lighting, updating signage and branding imagery, and various back-of-house work.  (Cookston Dec., ¶ 13.)

## PLAINTIFF'S ONE VISIT TO THE PROPERTY

51.     Plaintiff frequently meets friends in the Times Square area.  (Pl. Dep., 20:6-13.)

52.     Plaintiff's girlfriend is Dedra de la Rosa ("de la Rosa").  De la Rosa is also a wheelchair user who, with the Parker Hanski firm, has filed 26 cases under Title III of the Americans with Disabilities Act.  (Pl. Dep., 22:6-8; Egan Dec., ¶ 6, Ex. C ("de la Rosa Dep."), 13:10-13; Ryan Dec., ¶¶ 4-5, Ex. B.)

53.     Plaintiff does not eat a lot of pizza, but when he patronizes Domino's, he generally visits stores in the vicinity of his apartment and de la Rosa's apartment.  (Pl. Dep., 27:10-28:16, 104:21-105:13.)

54.     Sometime in the Fall of 2016, Plaintiff went to the movies in Times Square with de la Rosa.  (Pl. Dep., 43:8-45:9.)

55.     Plaintiff does not recall the date, month, or day of the week of this visit, but only that it was early in the evening.  (Pl. Dep., 44:2-13.)

56.     After the movie, Plaintiff and de la Rosa traveled west to 8th Avenue, and then two blocks south from the movie theatre on West 42nd Street to West 40th Street.  (Pl. Dep., 48:2-49:21.)

57.     On request, a passerby who had a Domino's box in his hands informed Plaintiff of the location of the Property.  (Pl. Dep., 45:13-17.)

58.     Plaintiff and de la Rosa did not remain outside of the Property for more than two minutes.  (de la Rosa Dep., 69:2-5.)  Plaintiff observed the step at the entrance, became upset, and left.  (Pl. Dep., 52:17-20.)

59.     While at the Property, Plaintiff did not discuss the step with de la Rosa.  (Pl. Dep., 52:23-53:7.)  In fact, Plaintiff did not discuss his experience at the Property until shortly before his deposition.  (Pl. Dep., 52:23-25, 53:2; de la Rosa Dep., 71:5-72:6.)

60.     Plaintiff did not take any photos, notes, or measurements of the Property.  (Pl. Dep., 77:21-78:7; de la Rosa Dep., 67:21-68:25.)

61.     Plaintiff did not try to communicate with store employees about the entrance step.  (Pl. Dep., 53:8-10.)

62.     Plaintiff also did not ask any personnel at the Property if there was a portable ramp he could use to access the store. (Pl. Dep., 55:2-6.)

63.     Additionally, Plaintiff did not attempt to contact any of the Defendants after his experience at the Property.  (Pl. Dep., 57:21-24.)

64.     After leaving the Property, Plaintiff and de la Rosa traveled to McDonald's on West 42nd Street.  (Pl. Dep., 55:8-19; de la Rosa Dep., 69:7-15.)

65.     Plaintiff has never returned the Property since his initial visit to evaluate its accessibility, or for any other reason.  (Pl. Dep., 62:3-13.)

66.     In fact, Plaintiff has not been back to West 40th Street between 7th Avenue and 8th Avenue since his initial visit.  (Pl. Dep., 61:21-62:9, 74:21-75:2.)

67.   Plaintiff will not use a portable (or temporary) ramp because he claims that they are not safe.  (Pl. Dep., 63:10-16.)

68.   Plaintiff has had one bad experience with a portable ramp at a store, but does not recall the store in question.  Specifically, Plaintiff attempted to go up the ramp and his wheelchair almost went backwards.  (Pl. Dep., 66:9-67:6.)

69.   Plaintiff describes himself as a "tester," and the Parker Hanski firm has represented him in approximately 16 other cases.  (Pl. Dep., 75:23-77:20; Ryan Dec., ¶¶ 2-3, Ex. A.)

70.   On February 11, 2019, Defendants served a Rule 68 Offer of Judgment providing for injunctive relief in the form of a portable ramp equipped with safety features, signage bearing the International Symbol of Accessibility ("ISA"), a doorbell, curbside service upon request, full reimbursement of Plaintiff's reasonably-incurred attorneys' fees to be determined by the Court, and damages in the amount of $10,000.  Plaintiff was not aware of this offer at his deposition. (Egan Dec., ¶ 20, Ex. Q; Pl. Dep., 154:7-155:3.)

71.   After Plaintiff did not accept the Rule 68 Offer of Judgment, Hat Trick provided a 12-foot-long portable ramp at the Property equipped with safety features that include edge protection, a non-slip surface, and a transition plate.  When in place, the running slope of the portable ramp is approximately 10%.  (Egan Dec., ¶ 21, Ex. R, at § 4.04, Appendix "A"; Cookston Dec., ¶ 18.)

72.   In addition, Hat Trick installed signage bearing the ISA, as well as a doorbell at the entrance.  Further, Hat Trick trained its employees on how to safely deploy the portable ramp and provide curbside service to customers with disabilities upon request.  (Egan Dec., ¶ 21, Ex. R, at Appendix "A"; Cookston Dec., ¶ 18.)

## DEFENDANTS' CONCEPTUAL DESIGN FOR A PERMANENT RAMP

73.     Defendants engaged an ADA expert, Douglas Anderson ("Anderson"), to review the Property in the summer of 2017 to evaluate accessibility options for the front entrance. (Egan Dec., ¶ 13, Ex. J ("Anderson. Dep."), 24:3-19.)

74.     Following this inspection, Anderson prepared a conceptual sketch for a permanent ADA ramp at the Property ("Anderson Sketch").  (Anderson Dep., 24:20-22; Egan Dec. ¶ 22, Ex. S.)

75.     The Anderson Sketch proposed to: (1) remove the existing two steps at the entrance; (2) lower the interior floor around the entrance door to the same elevation as the sidewalk; and (3) construct a permanent interior ramp leading from the entrance door to the raised interior floor.  (Egan Dec. ¶ 22, Ex. S.)

76.     In preparing the Anderson Sketch, Anderson took measurements on-site and performed a visual inspection, but did not evaluate structural conditions at the Property. (Anderson Dep., 24:23-25:13.)

## STRUCTURAL INVESTIGATION AND FINDINGS

77.     Defendants subsequently engaged a licensed structural engineer, David Keene, P.E. ("Keane"), to evaluate the structural conditions of the Property as it relates to potential accessibility options for the entrance.  (Egan Dec., ¶ 10, Ex. G ("Keane Dep.") 8:21-9:5.)

78.     Based on the unavailability of original structural drawings for the Property, and following an on-site review, Keane prepared a plan document in March 2018 for conducting an invasive structural investigation of the Property (the "Probe Plan").  (Keane Dep., 9:6-19, 27:14-23; Keane Dec., ¶ 4, Ex. A.)

79.     The Probe Plan provided for the removal of flooring at 18 inch-by-18 inch areas to expose the reinforced concrete slab that supports the Property (and the Building), as well as to drill through the entire floor slab at specified locations.  (Keane Dep., 9:6-19, 27:14-23; Keane Dec., ¶ 4, Ex. A.)

80.     The purpose of this investigation was to determine information about the structural conditions of the Property, specifically, with respect to the concrete slab at the first floor.  (Keane Dep., 27:2-3, 28:4-17, 41:7-42:10.)

81.     A contractor performed the excavation of flooring material and concrete during overnight hours so as to not disturb the operations of other tenants in the Building, including the CUNY School of Journalism.  (Keane Dep., 26:6-20.)

82.     From the probes, Keane determined the thickness of the floor topping, the diameter, size and spacing of the reinforcement (*i.e.*, rebar) within the concrete slab, and also the slab's thickness, at designated locations.  (Keane Dep., 39:9-21, 41:7-42:10, 46:18-47:11; Egan Dec., ¶ 23, Ex. T.)

83.     At the probed locations, the concrete reinforcement was located a few inches below the floor surface.  That surface is approximately two feet higher than the sidewalk adjacent to the Property entrance.  (Keane Dec., ¶ 6; Egan Dec., ¶ 23, Ex. T.)

84.     In addition to supervising the structural investigation and assessing the conditions that it revealed, Keane conducted due diligence on the Property, including by reviewing the Certificate of Occupancy.  (Keane Dep., 12:14-13:2.)

85.     Keane determined that the structural requirements for the Property were considerably more stringent than for a typical retail space (*i.e.*, more than double the live load capacity requirement).  (Keane Dep., 13:3-25.)

86.     Keane performed a structural analysis based on his findings to determine what reinforcement would be necessary to construct a permanent accessible entrance.  (Keane Dep., 9:6-19.)

## **ENGAGEMENT OF ARCHITECT DAVID WEINER**

87.     Defendants engaged a licensed architect, David Weiner, in early 2018 to investigate and prepare plans for a permanent accessible entrance to the Property.  (Egan Dec., ¶ 9, Ex. F ("Weiner Dep."), 8:20-24, 9:25-10:6.)

88.     Weiner worked in collaboration with Keane, since removing the two entrance steps to the Property would require altering the reinforced concrete floor slab that provides structural support for the Building.  (Weiner Dep., 14:19-22.)

89.     Weiner evaluated three options for a permanent accessible entrance: (1) an interior ramp; (2) a vertical platform lift (*i.e.,* a platform that moves in a vertical direction, similar to an elevator); and (3) an incline platform lift (*i.e.*, a platform that moves up and down stairs in an inclined direction).  (Weiner Dep., 13:9-19; Weiner Dec., ¶ 3.)

90.     With respect to the ramp option, Weiner reviewed the Anderson Sketch as part of his analysis.  (Weiner Dep., 30:25-31:9, 32:25-34:14.)

91.     Weiner prepared conceptual drawings for these three options, as reflected below. (Weiner Dec., ¶¶ 4-7, Exs. A-C.)



**(Fig. 1: Conceptual drawing showing removal of the two entrance steps and installation of a permanent interior ramp) (Weiner Dec., ¶ 5, Ex. A.)**



**(Fig. 2: Conceptual drawing showing incline platform lift) (Weiner Dec., ¶ 6, Ex. B.)**



**(Fig. 3: Conceptual drawing showing a vertical platform lift) (Weiner Dec., ¶ 7, Ex. C.)**

92.     Weiner and Keane selected a design for an incline lift because, of the three

alternatives considered, they believed that this option would require the least structural

intervention and would be the most cost-effective.  (Weiner Dep., 14:6-18, 34:12-18; Keane Dep., 31:23-34:2.)

93.     Keane prepared structural plans for the installation of an incline platform lift, in collaboration with Weiner (the "Structural Drawings").  (Keane Dep., 9:6-19, 10:2-15, 11:15-13:11, 20:13-22:16; Keane Dec., ¶ 7, Ex. B.)

94.     Keane prepared the Structural Drawings to identify the scope of work required to cut into the structural concrete at the first floor and provide structural reinforcement to accommodate the lift.  (Keane Dep., 21:13-17.)

95.     The Structural Drawings require the complete removal of an approximate area of 9 feet by 9 feet of the first floor concrete slab (81 square feet in total), to remove the two entry steps and lower the floor immediately adjacent to the door to the same elevation as the sidewalk. (Keane Dec., ¶ 8.)

96.     This alteration would require severing the rebar connections within the concrete floor slab that provide structural support to the Building.  (Keane Dep., 15:15-15:19.)



**(Fig. 4: Demolition plan with area of floor concrete to be excavated highlighted in yellow) (Weiner Dec., ¶ 8, Ex. D; Keane Dec., ¶ 8.)**

97.     The concrete slab would be re-poured at a lower elevation, so that the area immediately adjacent to the entrance door is the same elevation as the sidewalk.  (Keane Dec., ¶ 9.)

98.     Based on the Structural Drawings, the concrete would be reinforced in several respects, including by: (1) placing a steel beam below the existing exterior door spanning approximately 21 feet, to be tied into the existing building columns; (2) installing steel framing to support the new concrete floor, and (3) installing two steel posts in the basement to support the new steel framing.  (Keane Dep., 15:5-19, 16:15-25; Keane Dec., ¶ 10.)

99.     Based on the design set forth in the Structural Drawings, these posts would connect the steel framing to footings installed in the soils beneath the existing Building foundation.  (Keane Dep., 16:15-25.)



**(Fig. 5: Structural plan document showing 21-foot long beam highlighted in green, new steel framing highlighted in yellow, and new steel posts/footings highlighted in red) (Keane Dec., ¶¶ 7, 11, Ex. B.)**

100.     Keane considered alternative designs, including using additional steel framing to connect to four building columns rather than two, in lieu of supporting the framing with two steel posts.  (Keane Dep., 18:16-19:6.)

101.    Keane selected the design set forth in the Structural Drawings because, in his assessment, it was the most cost-effective among the alternatives.  (Keane Dep., 18:16-19:6.)

102.    This also included consideration of an interior ramp, which Keane evaluated and concluded would require excavation of significantly more structural material.  (Keane Dep., 31:23-34:2.)

103.    To be implemented, the Structural Drawings would nonetheless require confirmation by a geotechnical engineer, through on-site testing, to confirm that the soils beneath the existing foundation of the Building have the capacity to support the two new footings.  (Keane Dep., 17:5-22; Weiner Dep., 24:8-9, 24:17-25:7.)

104.    The Structural Drawings are based on an assumption that the installation of these footings would be feasible.  (Keane Dec., ¶ 12; Keane Dep., 17:5-22; Weiner Dep., 38:18-39:10.)

105.    In addition, Weiner prepared architectural plans for submission to the New York City Department of Buildings for the incline lift. ("Architectural Drawings").  (Weiner Dep., 15:11-17:11; Weiner Dec., ¶ 8, Ex. D.)

106.    Excerpts from the Architectural Drawings showing plan (*i.e.*, top-down) and elevation (*i.e.*, side) views of this design are as follows:



**(Fig. 6: Drawing showing plan view of alteration to install incline platform lift) (Weiner Dec., ¶ 8, Ex. D.)**



**(Fig. 7: Drawing showing elevation view of alteration to install incline platform lift. New 21-foot long beam highlighted in green, new steel framing highlighted in yellow, new steel posts/footings highlighted in red, and new concrete floor slab highlighted in blue)  (Weiner Dec., ¶¶ 8-9, Ex. D.)**

107.     In terms of architectural alterations, after the floor is lowered, a lift would be purchased, installed on the new floor, and supplied with power.  (Weiner Dec., ¶ 10.)

108.     In addition, to accommodate the new lowered floor area and incline lift, the entrance door and framing would be replaced, new steps would be placed at locations set back

farther from the entrance, and flooring material would be installed on top of the new slab to match what currently exists at the Property.  (Weiner Dec., ¶ 11.)

109.    There are many mechanical, electrical and other connections running along the underside of the first floor slab (as shown below).  (Weiner Dep., 24:8-16.)

110.    The above design assumes, not only that the bearing capacity of the soil beneath the basement floor are sufficient to handle the additional load (subject to confirmation by a geotechnical engineer), but also that it would be feasible to relocate or reconfigure these connections.  (Weiner Dep., 24:3-25:7, 38:19-39:10.)

 

**(Figs. 8 (left) and 9 (right): Showing underside of first floor concrete slab at the Property from the basement of the Building) (Weiner Dec., ¶ 12, Exs. E-F.)**

### BIDS RECEIVED FOR INSTALLATION OF THE INCLINE LIFT

111.    After preparing the Architectural Drawings, Weiner submitted the project to bid. (Weiner Dep., 52:19-25.)

112.    Weiner specifically requested proposals from four contractors: two submitted proposals, one expressly declined to bid, and another did not respond.  (Weiner Dep., 75:13-76:6.)

113.     One contractor, Reidy Contracting, provided a proposal for $233,230.  (Weiner Dep., 52:16-53:22; Egan Dec., ¶ 24, Ex. U.).

114.     Another contractor, Qwest Contracting, provided a proposal for $199,000. (Weiner Dep., 56:24-57:12; Egan Dec., ¶ 25, Ex. V.)

115.     Both proposals have a number of exclusions.  (Weiner Dep., 53:4-22; Egan Dec., ¶ 24, Ex. U, at 230W41ST000019-20; Egan Dec., ¶ 25, Ex. V, at 230W000015-16.)

116.     The proposals excluded, for example, the costs to relocate mechanical, electrical and plumbing and other services in the area to be altered, permitting and other anticipated expenses, and additional labor costs to perform the work during overnight hours so as to not disturb the operations of other tenants in the Building, including the CUNY School of Journalism.  (Weiner Dep., 53:14-22; Keane Dep., 26:6-20; Egan Dec., ¶ 24, Ex. U, at 230W41ST000019-20; Egan Dec., ¶ 25, Ex. V, at 230W41ST000016; Steele Dec., ¶ 15.)

117.     In addition, Weiner obtained a proposal from Handi-Lift, a company that specializes in supplying and installing ADA lifts, for $23,969, but the estimate did not include any of the costs to modify the Property to accommodate the lift, including structural modifications and reinforcement, or to provide installation services with union laborers as required in the Building.  (Weiner Dep., 45:15-46:18; Egan Dec., ¶ 26, Ex. W.)

**ALTERNATIVE INTERIOR RAMP DESIGNS BY PLAINTIFF'S EXPERT: DRAWINGS SK-01 AND SK-02**

118.     Plaintiff identified Michael Mitchell as an expert witness.  (Egan Dec., ¶ 27, Ex. X.)

119.     Mitchell is an architect who does not consider himself an expert in any specific area of architecture (and does not believe anyone can be an expert in architecture, generally, based on the breadth of the subject matter).  (Mitchell Dep., 12:20-14:19.)

120.    Mitchell conducted an inspection of the Property in May 2019 and issued a written report of his findings (the "Mitchell Report").  (Mitchell Dep., 21:24-22:11; Egan Dec., ¶ 21, Ex. R.)

121.    Before the inspection, Mitchell performed a "cursory" (*i.e.*, an approximate 20-minute) review of the Building Information System website, which is maintained by the New York City Department of Department of Buildings.  (Mitchell Dep., 46:4-15, 48-11-22.)

122.    The only purported instance of non-compliance with the ADA Standards for Accessible Design or the New York City Building Code noted during Mitchell's inspection concerned the presence of two steps at the entrance of the Property.  (Mitchell Dep., 29:20-30:7; Egan Dec., ¶ 21, Ex. R.)

123.    The Mitchell Report recommends that the existing stepped entrance condition at the Property be modified to allow for the construction of a permanent accessible entrance that conforms to the 2010 ADA Standards for Accessible Design.  (Egan Dec., ¶ 21, Ex. R.)

124.    Appended to the Mitchell Report are two drawings of interior permanent ramp options at the Property: the drawing designed "SK-01," and the other designated "SK-02." (Mitchell Dep., 40:20-41:20; Egan Dec., ¶ 21, Ex. R.)

125.    Both designs would require raising the public sidewalk by approximately 7 inches to create a flat landing at the same approximate elevation as the top of the first existing entrance step, removal of existing flooring material, and installation of a permanent interior ramp. (Mitchell Dep., 94:7-96:9, 102:19-103:10, 109:10-20.)

126.    As the sidewalk already pitches downward from the Building to the curb, the installation of a level sidewalk landing as per either SK-01 or SK-02 would increase the slope running perpendicular to the direction of pedestrian travel (*i.e.,* cross slope) from the southern

20

edge of the landing to the curb, which Mitchell estimates will be between 1.67%-5%.  (Mitchell

Dep., 108:5-113:18; Egan Dec., ¶¶ 28-29, Exs. Y-Z.)

127.    In terms of differences between the designs, SK-02 shows the ramp in a different

location and orientation than SK-01, and would require removal of more than twice as much

structural slab than SK-01.  (Mitchell Dep., 41:13-20, 86:17-87:11, 95:20-96:22.)



**(Fig. 10: SK-01 with the areas of flooring to be removed highlighted in yellow, the
ramp highlighted in blue, the new sidewalk landing highlighted in green, and the
estimated cross slope between that landing and the curb highlighted in red)
(Mitchell Dep., 94:7-96:9, 102:19-103:10, 110:8-11:8, 169:10-18; Egan Dec., ¶ 28, Ex.
Y.)**



**(Fig. 11: SK-02 with the areas of flooring to be removed highlighted in yellow, the ramp highlighted in blue, the new sidewalk landing highlighted in green, and the estimated cross slope between that landing and the curb highlighted in red) (Mitchell Dep., 94:7-96:9, 102:19-103:10, 110:8-11:8, 169:10-18; Egan Dec., ¶ 29, Ex. Z.)**

128.    According to Mitchell, both SK-01 and SK-02 contemplate alterations to the structural concrete slab at the first floor of the Property.  (Mitchell Dep., 73:22-74:3.)

### PLAINTIFF'S INTERIOR RAMP DESIGNS WOULD REQUIRE UNKNOWN STRUCTURAL MODIFICATIONS AND REINFORCEMENT

129.    According to Mitchell, the engagement of a structural engineer is required for projects that involve, for example, various forms of concrete slabs.  (Mitchell Dep., 19:2-20:4.)

130.    The expertise of a structural engineer is required when renovations involve manipulation of these slabs and related reinforcement work.  (Mitchell Dep., 20:12-21:2.)

131.    For an existing facility, a structural engineer would oversee selective demolition (*i.e.*, probing) of concrete flooring to gain insight into the composition of the structural material. (Mitchell Dep., 21:3-21:19.)

132.    A structural engineer would develop a design that, with the architect's plans, would "mesh" to provide coordinated design packages.  (Mitchell Dep., 21:3-21:19.)

133.   Mitchell is not an expert in structural engineering.  (*Id.*)

134.   Plaintiff did not identify a purported expert in structural engineering in discovery. (Egan Dec., ¶ 27, Ex. X.)

135.   Mitchell did not review the Structural Drawings, and did not discuss or collaborate with a structural engineer in preparing the Mitchell Report.  (Mitchell Dep., 69:3-10, 79:2-9, 86:17-25, 99:23-100:2, 101:2-8, 225:11-17.)

136.   While SK-01 and SK-02 propose to remove less of the flooring material than the Architectural Drawings, Mitchell testified that structural analysis would be required to determine whether these designs would require less structural reinforcement, and thus impose less cost. (Mitchell Dep., 75:2-12.)

137.   Mitchell prepared these sketches without knowing the location of the structural slab within the floor, or its thickness.  (Mitchell Dep., 76:3-7, 89:11-90:5, 91:25-92:12, 92:24-93:19.)

138.   Mitchell conceded that reducing the thickness of the structural slab, even without fully demolishing it, would require various means of structural reinforcement, none of which is shown in either SK-01 or SK-02.  (Mitchell Dep., 98:7-99:9; Egan Dec.,¶¶ 28-29, Exs. Y-Z.)

139.   This is because no structural drawings or propositions informed these designs. (Mitchell Dep., 101:2-7.)

### NO COST INFORMATION IN CONNECTION WITH SK-01 OR SK-02

140.   In preparing the alternative ramp designs, Mitchell reviewed the Architectural Drawings and attempted to propose a potentially less costly solution by (1) eliminating the cost of purchasing and installing a lift, and (2) depressing the first floor slab to a lesser extent than what is shown in the Architectural Drawings.  (Mitchell Dep., 63:24-64:25, 74:4-13.)

141.    Mitchell's appreciation of cost was in "very general sense" to evaluate work that "might be more expensive than another type of work."  (Mitchell Dep., 60:2-21, 68:5-10.)

142.    Mitchell's objective in preparing SK-01 and SK-02 was "to do something that's even less expens[ive] [than the Architectural Drawings] that could be interesting."  (Mitchell Dep., 72:24-73:2.)

143.    While Mitchell's "starting position" for his designs was the Architectural Drawings, he did not analyze the costs to implement the Architectural Drawings, or address costs in any manner in his Report.  (Mitchell Dep. 65:17-25, 66:12-16; Egan Dec., ¶ 21, Ex. R.)

144.    Mitchell was also unfamiliar with the Reidy Contracting and Qwest Contracting bids for the work set forth in the Architectural and Structural Drawings, and did not review the Handi-Lift estimate before drafting his report.  (Mitchell Dep., 225:17-226:20.)

145.    Mitchell "guestimated" that the purchase and installation of the lift identified in the Architectural Drawings "might be on the order of $25,000-$40,000" and made a "rough guess" at the full cost of implementing the Architectural Drawings as "probably $100,000 to $125,000", but subject to the caveat that he "could be off given how . . . [Mitchell is] constantly surprised at how expensive things are in Manhattan."  (Mitchell Dep., 68:5-69:2, 72:2-73:5.)

146.    Mitchell acknowledged he is not a cost estimator, and particularly in New York City where "costs can be so wildly different depending on who you're talking to, who you're bidding, or what the market is like."  (Mitchell Dep., 60:2-21, 224:16-20.)

147.    Other than his deposition testimony that he did not believe that a remedy for the entrance would be "ostentatiously expensive," Mitchell failed to provide any estimate or indication of costs to implement either SK-01 or SK-02.  (Mitchell Dep., 62:18-63:20.)

## UNKNOWN COLLATERAL IMPACTS OF SK-01 AND SK-02

148.    Constructing the new sidewalk landing adjacent to the Property entrance will require re-grading the public sidewalk leading to that landing from the adjacent retail business, a Jack's store.  (Mitchell Dep., 118:10-119:8.)



**(Fig. 12: Image of storefront including the Property and adjacent Jack's store) (Egan Dec., ¶ 30, Ex. AA.)**

149.    SK-01 and SK-02 require a running slope (*i.e.*, slope parallel to the direction of travel) of no more than 5% (or 1:20) between the new sidewalk landing and the Jack's easternmost door.  However, the drawings do not indicate how much of the sidewalk will need to be replaced, or whether and to what extent the Jack's door will need to be altered.  (Egan Dec., ¶¶ 28-29, Exs. Y-Z.)

150.    Mitchell admitted that he did not know whether his designs would be workable as it relates to the current configuration of the Jack's door.  (Mitchell Dep., 122:3-123:3.)

## INSUFFICIENT RAMP LANDING IN SK-01

151.    Mitchell admittedly failed to design SK-01 with the required 5-foot long bottom landing.  (Mitchell Dep., 87:19-88:9.)

152.    The drawing shows a 4-foot landing.  (Mitchell Dep., 87:19-88:9.)

153.    A longer landing would be required, and the ramp would need to be repositioned accordingly.  (Mitchell Dep., 88:10-13.)



**(Fig. 13: SK-01 with 4-foot bottom ramp landing identified in green highlighting) (Mitchell Dep., 87:19-88:9; Egan Dec., ¶ 28, Ex. Y.)**

## INCORRECT DIMENSIONING OF INTERIOR FLOOR LEVEL IN SK-01 AND SK-02 AND IMPACTS ON DESIGN

154.    Mitchell incorrectly calculated the elevation of the interior floor as 13 inches above the sidewalk as shown in SK-01 and SK-02, whereas this elevation is approximately 14-14.5 inches.  (Mitchell Dep., 133:24-137:7, 141:17-144:21, 154:3-9.)

155.    Thus, either the interior ramp or sidewalk design must be modified in a manner not reflected in these drawings.  Specifically, the interior ramp would need to be longer and equipped with handrails.  (Mitchell Dep., 144:22-148:3.)

156.    Alternatively, if the landing is raised, the Jack's door would need to be replaced and raised to accommodate the new slope.  (Mitchell Dep., 148:4-152:3.)

## SK-01 AND SK-02 NOT DESIGNED TO CONNECT TO EXTERIOR ACCESSIBLE ROUTE

157.    The landing shown in SK-01 and SK-02 would extend less than three feet (specifically, 27 inches) from the façade of the Building.  (Mitchell Dep., 160:3-7.)

158.    Mitchell's designs for an accessible entrance and landing are not intended to connect with a 36-inch wide accessible route running parallel with the direction of pedestrian travel.  (Mitchell Dep., 159:21-160:7, 163:23-164:4.)

159.    To the contrary, Mitchell's designs contemplate a wheelchair user or another person with a mobility disability approaching the entrance landing from potentially any vector along the re-graded public sidewalk, including from a direction requiring that person to traverse a cross slope of between 1.67%- 5%.  (Mitchell Dep., 154:10-155:11, 161:5-11, 161:5-10.)

160.    Mitchell did not design SK-01 and SK-02 to connect to an exterior accessible route.  (Mitchell Dep., 159:21-160:7, 163:23-164:4.)

161.    In fact, Mitchell was not aware of the ADA's position on slope and accessible route considerations as it relates to designs on the public sidewalk.  (Mitchell Dep., 168:4-20, 169:10-170:4.)

162.    The Mitchell Report identifies the fact that the portable ramp at the Property has a running slope of over 10%.  (Egan Dec., ¶ 21, Ex. R.)

163.    Mitchell nonetheless conceded at his deposition that it would be impossible to achieve a slope of 8.33% because, based on the downward slope of the sidewalk from the Property entrance to the curb, a ramp long enough to meet this maximum dimension would extend out into to 40th Street.  (Mitchell Dep., 218:16-219:21.)

164.    Thus, there would be no maneuvering clearance for a wheelchair user to enter the ramp from the bottom given the site constraints.  (Mitchell Dep., 222:4-16.)

165.     Mitchell admitted that he has never seen a portable ramp with 4-inch high edge

protection, or that is 36 inches wide, as it relates to the alleged violations in the Mitchell Report.

(Mitchell Dep., 223:20-22, 220:4-11; Egan Dec., ¶ 21, Ex. R.)



**(Fig. 14: Photo "14" in the Mitchell Report reflecting portable ramp, ADA signage and buzzer) (Egan Dec., ¶ 21, Ex. R, at Appendix "A".)**

## DEFENDANTS' FINANCIAL AND OPERATIONAL CONSIDERATIONS

166.     Because of its union obligations, 230 West requires that all contractors conducting

renovation work use union labor.  (Steele Dec., ¶ 14.)

167.     The tenants above the first floor, including the CUNY School of Journalism, lease

office space in the Building.  (Steele Dec., ¶ 13)

168.     Accordingly, construction activities causing excessive noise would have to be

performed during non-operating hours.  (Steele Dec., ¶ 13.)

169.     230 West is required to secure the Building during any overnight construction

work, since there is no security staffing provided on a 24-hour basis.  (Steele Dec., ¶ 15.)

170.     Any security personnel who perform work at the Property during overnight hours

must also be paid at overtime wage rates.  (Steele Dec., ¶ 15.)

171.    While 230 West collects annual rent revenues in the millions, it also has a loan balance of $63,258,038 from its purchase of the Building.  (Steele Dec., ¶ 7.)

172.    230 West must also maintain cash and cash equivalents in reserve, as the Building is maintained through repairs and capital improvements as needed  (Steele Dec., ¶ 8.)

173.    There are two vacant floors in 230 West that are not generating any revenue for 230 West, amounting to a shortfall of between ██████ and ██████, depending on rent charged.  (Steele Dep., 57:12-20.)

174.    230 West has to budget for the cost of tenant space improvements required under work letters.  (Steele Dep., 71:9-15.)

175.    Other than work letters, 230 West is not obligated to provide funding for tenant renovations.  (Steele Dep., 68:11-72:2.)

176.    Excess revenue after operating expenses, debt services and reserves collected by 230 West for the Building is made available to the Foundation to support its operating expenses.  (Steele Dec., ¶ 9.)

177.    The Foundation is a not-for-profit corporation that is critical to the many research initiatives and projects of CUNY.  It has its only office located in the West 41st Street Building, and directly employs approximately 200 people at that location.  (Steele Dep., 7:20-8:6; Steele Dec., ¶ 10.)

178.    Specifically, the Foundation is the fiscal agent for all grants and contracts for CUNY.  (Steele Dep., 8:6-14; Steele Dec., ¶ 11.)

179.    Based on relatively flat levels of grant-based revenue over the last several years, 230 West effectively subsidizes the Foundation and, in turn, its public mission of supporting CUNY research initiatives.  (Steele Dep. at 56:3-57:2; Steele Dec., ¶ 12.)

180.    Funding for installation of a permanent ramp or lift at the Domino's store would have to come from 230 West's operating budget.  (Steele Dep., 61:3-14.)

181.    The retail space immediately to the west of the Property is a Jack's store, which has a vertical platform lift.  No funds from 230 West were spent for the purpose of wheelchair accessibility at the Jack's store.  (Steele Dep., 64:24-65:2, 66:6-18; Egan Dec., ¶ 30, Ex. AA.)

182.    As per the Qwest Contracting bid, if the cost of the lift is $199,000 (putting aside the exclusions or any unforeseen expenses or change orders), then that amount would be comparable to Hat Trick's current rental payments for ████████.  (Cookson Dec., ¶ 6, Egan Dec., ¶ 24, Ex. U, ¶ 31, Ex. BB, at 230W41ST000093.)

183.    The construction required to implement the lift would require the Property, a retail and food service establishment, to close for approximately 3 to 4 weeks, and potentially longer if unforeseen conditions arise.  (Weiner Dec., ¶ 13.)

184.    If the lift were to close for weeks to install the lift, Hat Trick's employees would be forced out of work for that period of time, and Hat Trick would suffer a loss of business of approximately ████████ for every two weeks that the store is closed.  (Cookston Dec., ¶¶ 19-20.)

185.    If Hat Trick was required to install the $199,000 ADA lift, it would have to give serious consideration to closing the store instead.  (Cookston Dec., ¶ 21.)

## THE ACTION

186.    The parties have attended two conferences before the Court, conducted a joint expert inspection, exchanged disclosures from 4 expert witnesses, and conducted 11 fact and expert depositions.  (Egan Dec., ¶ 32.)

187.    On October 17, 2019, the parties participated in this District's Mediation Program, which did not result in a settlement.  (Egan Dec., ¶ 33.)

188.    Plaintiff has not produced any documents in discovery, including proof that he provided notice of this lawsuit to the New York State Attorney General.. (Egan Dec., ¶ 34.)

189.    This lawsuit is one of 17 similar actions that Plaintiff has filed in this District alleging the presence of architectural barriers.  (Ryan Dec., ¶¶ 2-3, Ex. A.)

190.    Plaintiff has not produced any documents in discovery, including proof that he provided notice of this lawsuit to the New York Attorney General.  (Egan Dec. ¶ 34.)

Dated: New York, New York              SEYFARTH SHAW LLP
       February 7, 2020


By:  */s/ John W. Egan*
     John W. Egan
     Paul H. Galligan
     Samuel Sverdlov
     jegan@seyfarth.com
     pgalligan@seyfarth.com
     ssverdlov@seyfarth.com
     620 Eighth Avenue, 32nd Floor
     New York, New York  10018
     (212) 218-5500

     *Attorneys for Defendant*
     *230 West 41st Street LLC*


LITCHFIELD CAVO LLP


By:  */s/ Angela M. Objay-Stenroos*
     Angela M. Objay-Stenroos
     stenroos@litchfieldcavo.com
     420 Lexington Avenue, Suite 2014
     New York, New York  10170
     (212) 434-0105

     *Attorneys for Defendant*
     *Hat Trick Pizza, Inc.*